UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

EARL DEESE and
CATHLINN DEESE,

                   Plaintiffs,

v.                                Case No. 3:06-cv-733-J-34HTS

CITY OF JACKSONVILLE,
FLORIDA, et al.,

                   Defendants.

_____

## ORDER

### I. Status

Plaintiffs Earl and Cathlinn Deese initiated this case, through counsel, by filing a Complaint and Demand for Jury Trial (Doc. #1) on August 15, 2006. They are proceeding on a First Amended Complaint and Demand for Jury Trial (Doc. #23) (hereinafter Amended Complaint), filed December 21, 2006. Plaintiffs name the following Defendants in the Amended Complaint: (1) the City of Jacksonville (COJ), Florida; (2) Correctional Medical Services, Inc. (CMS); (3) Dr. Carey Goodman; and, (4) Physician Assistant (P.A.) Nelson Aguilar.[1]

Plaintiff Earl Deese contends that the Defendants were deliberately indifferent to his serious medical needs when he was incarcerated at the John E. Goode Pretrial Detention Facility

_____

[1] The Plaintiffs misspell this Defendant's last name as "Aguillar" in the Amended Complaint. The Court will hereinafter utilize the correct spelling of this Defendant's last name.

(PTDF) in Jacksonville, Florida.  He also raises a pendent state law negligence claim against each Defendant. Plaintiff Cathlinn Deese asserts a loss of consortium claim against all four Defendants.

This cause is before the Court upon the following motions: (1) Defendant, Nelson Aguilar, P.A.'s, Motion for Partial Summary Judgment as to the Chapter 42 United States Code Section 1983 Claim and Memorandum of Law in Support Thereof (Doc. #53) (Aguilar's Motion); (2) Defendant, Nelson Aguilar, P.A.'s, Supplemental Motion for Partial Summary Judgment as to the Medical Negligence Claim and Memorandum of Law in Support Thereof (Doc. #59) (Aguilar's Supplemental Motion); (3) Defendant Carey Goodman, M.D.'s Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (Doc. #57) (Goodman's Motion); (4) Defendant, City of Jacksonville's, Motion for Partial Summary Judgment as to the Chapter 42 United States Code Section 1983 Claim and Memorandum of Law in Support Thereof (Doc. #62) (COJ's Motion); and, (5) Defendant, Correctional Medical Services, Inc.'s, Motion for Summary Judgment and Motion for Judgement on the Pleadings and Memorandum of Law in Support Thereof (Doc. #64) (CMS's Motion).

On June 9, 2008, Plaintiffs filed Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (Doc. #70) (Plaintiffs' Opposition).   Thereafter, Defendants sought, and were granted, leave to file a reply to

- 2 -

Plaintiffs' Opposition.  Defendant Carey Goodman, M.D.'s Reply to Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (Doc. #80) was filed on July 14, 2008.  Defendants', Correctional Medical Services, Inc., Nelson Aguilar, P.A., and City of Jacksonville, Reply to Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions for Summary Judgement (Doc. #81) was filed on July 17, 2008.  Thus, the summary judgment motions are ripe for review.

## II.  Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Crawford v. Carroll, 529 F.3d 961, 964 (11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and Wilson v. B/E/Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).

The parties' respective burdens and the Court's responsibilities are outlined as follows:

> The movant bears the responsibility for demonstrating the basis for the summary judgment motion. [Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).] A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment. Anderson, 477 U.S. at 247-48, 106 S.Ct. 2505 (1986). An issue is genuine if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. 2505).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. 2548). If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003).

<u>Allen v. Board of Public Educ. for Bibb County</u>, 495 F.3d 1306, 1313-14 (11th Cir. 2007).

"It is true that on a motion for summary judgment, all reasonable inferences must be made in favor of the non-moving party." <u>Cuesta v. School Bd. of Miami-Dade County</u>, 285 F.3d 962, 970 (11th Cir. 2002) (citation omitted). "A court need not permit a case to go to a jury, however, when the inferences that are drawn

- 4 -

from the evidence, and upon which the non-movant relies, are 'implausible.'" <u>Id</u>. (citations omitted).

The United States Supreme Court has explained how to determine whether there is a genuine issue for trial.

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

<u>Scott v. Harris</u>, 127 S.Ct. 1769, 1776 (2007).

### III.  Plaintiffs' Allegations

Plaintiffs allege the following facts in their Amended Complaint.  On or about January 26, 2004, Plaintiff Earl Deese was incarcerated as a pretrial detainee at the PTDF.  Amended Complaint

at 3.  At the time of his admission, he was sixty-seven years old.
Id.  Upon his arrival, Mr. Deese informed CMS staff members of his
medical ailments, "including, but not limited to, diabetes mellitus
and staph infections, and further advised CMS' staff as to the
medications he was taking, including, but not limited to,
Nitroglycerin,1 [sic] Dicloxacillin, Lipitor, Glyburide, Metaform,
Ensupril, Enteric ASA, Lopressor, Lacenapril, Analodapen, and
Inspir." Id. at 3-4.  He also told CMS staff members that he was
supposed to be taking Dicloxacillin for the remainder of his life
due to his history of staph infections.  Id. at 4.  CMS employees
discussed Mr. Deese's medical history and current medical condition
with Dr. Goodman within one day after Mr. Deese was admitted to the
PTDF.  Id.

On or about February 26, 2004, Mr. Deese told CMS employees
that he had a sore on his right toe and requested that he be
permitted to wear his "diabetic shoes."  Id.  "Following his
request for diabetic shoes, Mr. Deese met with Defendant Aguilar
and advised [Defendant Aguilar] that he wanted to see a doctor due
to his history of diabetes, as well as his history of recurring
staph infections for which he was to receive antibiotics."  Id.
P.A. Aguilar examined Mr. Deese's right foot, in particular the
open sore on his right big toe, and told Mr. Deese that a doctor
would examine him in the near future.  Id.  On or about February
27, 2004, after being advised of Mr. Deese's complaints, Dr.

- 6 -

Goodman told CMS employees that he would examine Mr. Deese the following week. _Id_. No "vascular work up of Mr. Deese's legs and/or feet was ordered, nor was Mr. Deese sent to the hospital for an evaluation of his condition." _Id_. Additionally, despite his history of staph infections, no antibiotics were given to Mr. Deese. _Id_.

On or about February 28, 2004, CMS employees started to give Mr. Deese Betadine foot soaks. _Id_. at 5. Approximately one week later, Mr. Deese told P.A. Aguilar that he needed to see a doctor because his toe was becoming discolored. _Id_. After examining Mr. Deese's right foot, P.A. Aguilar told Mr. Deese that the toe and foot appeared to be fine and that he should continue with the Betadine soaks. _Id_.

On or about March 9, 2004, Mr. Deese reported to the PTDF's medical clinic and told CMS personnel that he was nauseous, had been vomiting and was very shaky. _Id_. CMS employees reported Mr. Deese's condition to Dr. Goodman. _Id_. Without conducting any examination of Mr. Deese, Dr. Goodman told CMS employees to provide no additional treatment for Mr. Deese, and Mr. Deese was returned to his cell. _Id_. On or about March 11, 2004, CMS employees requested that Dr. Goodman examine Mr. Deese, but Dr. Goodman failed to do so. _Id_.

On or about March 13, 2004, CMS employees observed that Mr. Deese had a temperature of 102 degrees, extremely low blood

pressure, a blue foot and a large sore on the big toe of his foot. Id. "A physician at Shands Hospital was contacted and advised to send Mr. Deese to Shands Hospital immediately." Id. "Upon admission to Shands Hospital, Mr. Deese was diagnosed with, among other things, gangrene in his right toe and severe sepsis."[2] Id. On March 17, 2004, Mr. Deese's right leg was amputated above the knee. Id. at 6.

### IV. Law and Conclusions

### A. Counts III and IV of the Amended Complaint

In Count III of the Amended Complaint, Plaintiffs claim that Dr. Goodman was deliberately indifferent to Mr. Deese's serious medical needs by failing to provide Mr. Deese adequate medical treatment, despite knowledge of his serious medical needs. Amended Complaint at 8. Similarly, in Count IV of the Amended Complaint, Plaintiffs claim that P.A. Aguilar was deliberately indifferent to Mr. Deese's serious medical needs by failing to provide him adequate medical treatment, despite knowledge of Mr. Deese's serious medical needs. Id. at 9. Plaintiffs contend that, as a proximate result of this deliberate indifference, "Mr. Deese suffered damages, including, but not limited to, loss of limb, loss of enjoyment of life, severe pain and suffering, and severe emotional distress and mental anguish." Id. at 8, 9.

---

[2] Sepsis is commonly called a blood stream infection. See www.medterms.com.

In Plaintiffs' Opposition, Plaintiffs contend that the serious medical need to which Defendants were deliberately indifferent was "an open sore on [Mr. Deese's] large right toe[.]"  Plaintiffs' Opposition at 6.  Plaintiffs assert that these two Defendants "knew Mr. Deese to be a long standing diabetic and were aware of the risks inherent with a diabetic patient forming sores on his lower extremities."  Id. at 7.  Plaintiffs further allege that the "delay in sending Mr. Deese to Shands Hospital for medical intervention worsened his plight as shortly after admission, his right leg had to be amputated above the knee."  Id.

> Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment.  See Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).  Correctional officers are, of course, bound by the Eighth Amendment's prohibition against cruel and unusual punishment.  Id.  Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like [Mr. Deese].  Snow ex rel. Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1268 (11th Cir. 2005).  However, the standards under the Fourteenth Amendment are identical to those under the Eighth.  Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005).

Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry."  Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting Farrow v. West, 320 F.3d

1235, 1243 (11th Cir. 2003)).  First, the plaintiff must satisfy the objective component by showing that he had a serious medical need.  <u>Goebert</u>, 510 F.3d at 1326.

> "A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  <u>Id</u>. (citing <u>Hill v. Dekalb Req'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994)).  In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm."  <u>Id</u>. (citation and internal quotations marks omitted).

<u>Brown</u>, 387 F.3d at 1351.

To satisfy the subjective component a plaintiff must show that the prison official acted with deliberate indifference to his serious medical need.  <u>Goebert</u>, 510 F.3d at 1326.

> In <u>Estelle</u>, the Supreme Court established that "deliberate indifference" entails more than mere negligence.  <u>Estelle</u>, 429 U.S. at 106, 97 S.Ct. 285; <u>Farmer</u>,[3] 511 U.S. at 835, 114 S.Ct. 1970.  The Supreme Court clarified the "deliberate indifference" standard in <u>Farmer</u> by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Farmer</u>, 511 U.S. at 837, 114 S.Ct. 1970 (emphasis added).  In interpreting <u>Farmer</u> and <u>Estelle</u>, this Court

---

[3] <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

explained in <u>McElligott</u>[4] that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." <u>McElligott</u>, 182 F.3d at 1255; <u>Taylor</u>,[5] 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

This Court has provided guidance concerning the distinction between "deliberate indifference" and "mere negligence." For instance, we have stated that "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." <u>Lancaster v. Monroe County</u>, 116 F.3d 1419, 1425 (11th Cir. 1997). Alternatively, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." <u>McElligott</u>, 182 F.3d at 1255. For example, a defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference. <u>Hill</u>, 40 F.3d at 1190 n. 26; <u>H. C. by Hewett v. Jarrad</u>, 786 F.2d 1080, 1086 (11th Cir. 1986) (citing <u>Ancata v. Prison Health Servs., Inc.</u>, 769 F.2d 700, 704 (11th Cir. 1985)).

<u>Farrow</u>, 320 F.3d at 1245-46.

In cases that turn on the delay in providing medical care, rather than the type of medical care provided, we have set out some factors to

---

[4] <u>McElligott v. Foley</u>, 182 F.3d 1248 (11th Cir. 1999).

[5] <u>Taylor v. Adams</u>, 221 F.3d 1254 (11th Cir. 2000).

> guide our analysis.   Where the prisoner has
> suffered increased physical injury due to the
> delay, we have consistently considered: (1)
> the seriousness of the medical need; (2)
> whether the delay worsened the medical
> condition; and (3) the reason for the delay.
> See Hill, 40 F.3d at 1189.

Goebert, 510 F.3d at 1327.

"The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm."  Id. (quoting Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)).  "Causation, of course, can be shown by personal participation in the constitutional violation."  Id. (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)).

The Court will first address the deliberate indifference claim against P.A. Aguilar.  P.A. Aguilar asserts that he is entitled to summary judgment with respect to the deliberate indifference claim against him because he was not deliberately indifferent to Mr. Deese's serious medical needs.

P.A. Aguilar alleges that he did not become involved in Mr. Deese's care until February 26, 2004, when he reviewed and responded to Mr. Deese's request for diabetic shoes.  P.A. Aguilar describes his involvement as follows:

> While seeing Plaintiff on February 26,
> 2004,[6] P.A. Aguilar noted in Plaintiff's

---

[6] The record reflects that P.A. Aguilar actually examined Mr. Deese on February 27, 2004, rather than February 26, 2004.

- 12 -

chart that Plaintiff was diabetic and had a
sore on his right toe from his sneaker.
Plaintiff then requested that his family be
allowed to bring his diabetic shoes from home.
At that time, Plaintiff also informed P.A.
Aguilar that he had a history of staph
infection on his left knee and was to take
Dicloxacillin, an antibiotic, for the rest of
his life.  Plaintiff also indicated that he
was seen at Shands ortho for this problem.
P.A. Aguilar followed this notation with
several question marks.  He then called the
jail clinic at Shands to verify that Plaintiff
was hospitalized in December for staph on his
knee.

     A physical examination of Plaintiff's
foot and knee revealed that his right foot was
dry and cracked and that there were no open
lesions on his first toe.  P.A. Aguilar did
note the scar on Plaintiff's left knee from a
prior bilateral total knee replacement.  He
documented that there was no swelling,
erythema, or crepitus (internal cracking or
popping) of the left knee.  After his
assessment, P.A. Aguilar ordered betadine foot
soaks twice daily for Plaintiff.  He also gave
permission for Plaintiff's family to bring his
diabetic shoes from home.

     Following his assessment on Friday,
February 26th, P.A. Aguilar spoke with Dr.
Goodman regarding Plaintiff's left knee
follow-up.  He indicated that Dr. Goodman
would see Plaintiff in the Chronic Care Clinic
and that there would be a follow-up the next
week.

     This is the extent of medical care
provided by P.A. Aguilar for Plaintiff's knee
and foot.  P.A. Aguilar did not see Plaintiff
again as there w[ere] no further inmate
medical requests or referrals, so there was no
indication or reason for him to believe that
it was necessary to see Plaintiff again.  P.A.
Aguilar took the appropriate steps to treat
the sore on Plaintiff's foot.  He also

> referred Plaintiff to Dr. Goodman for a
> follow-up with his left knee.

Aguilar's Motion at 3-4.

Although Plaintiffs state in the Amended Complaint that P.A. Aguilar saw Mr. Deese a second time (approximately one week after he ordered the Betadine foot soaks), Plaintiffs do not reassert that contention in Plaintiffs' Opposition. In Plaintiffs' Opposition, they set forth their version of the facts, which does not include a second meeting between P.A. Aguilar and Mr. Deese. Mr. Deese's medical records do not reflect that P.A. Aguilar had any contact with Mr. Deese other than the February 27, 2004, examination that P.A. Aguilar conducted in response to Mr. Deese's request for his diabetic shoes. Aguilar's Deposition[7] at 42. Moreover, Mr. Deese's deposition does not reflect that he saw P.A. Aguilar again after February 27, 2004. Accordingly, it appears to be undisputed that P.A. Aguilar's only contact with Mr. Deese occurred on February 27, 2004.

The record reflects that Mr. Deese submitted an Inmate Medical Request form at 11:05 a.m. on February 26, 2004, in which he stated, "I NEED TO RECIVE [sic] MY DIBETIC [sic] SHOES FROM HOME." Medical Records[8] at 4; Aguilar's Deposition at 15; Mr. Deese's

---

[7] The Deposition of Nelson Aguilar, P.A. (Doc. #64-2) (Aguilar's Deposition) is appended to CMS's Motion (Doc. #64).

[8] Excerpts from Mr. Deese's inmate medical records (Doc. #64-7) (Medical Records) are appended to CMS's Motion (Doc. #64).

Deposition[9] at 88.  In response to this request, P.A. Aguilar met
with Mr. Deese on February 27, 2004, at 10:30 a.m.  Medical Records
at 5.  P.A. Aguilar's notations on the "Health Care Documentation"
portion of the Inmate Medical Request form reflect that Mr. Deese
stated he was diabetic and he had a sore on his right toe,
secondary to wearing a sneaker.  Aguilar's Deposition at 22;
Medical Records at 5.  The notes further reflect that Mr. Deese
requested that his diabetic shoes be brought to him from his home.
Id.  Mr. Deese also reported that he had a history of staph
infections in his left knee and he was supposed to take
Dicloxacillin "for life."  Aguilar's Deposition at 22-23; Medical
Records at 6.

P.A. Aguilar noted in Mr. Deese's medical record that the tip
of the big toe on Mr. Deese's right foot was dry and cracked, but
there were no open lesions.  Aguilar's Deposition at 23, 28;
Medical Records at 5.  He also noted that Mr. Deese's left knee had
a scar, but there was no swelling, no erythema[10] and no crepitus.[11]
Aguilar's Deposition at 23; Medical Records at 5.

---

[9] The Deposition of Earl Deese (Doc. #64-4) (Mr. Deese's
Deposition) is appended to CMS's Motion (Doc. #64).

[10] "Erythema means redness of the skin."  Aguilar's Deposition
at 53.

[11] "Crepitus is a sound that is created when probably two bones
could rub against each other, you hear a crackling, you feel
actually a crackling between that area that you examine." Aguilar's
Deposition at 53.

In the assessment portion of the form, P.A. Aguilar stated "diabetes mellitus" and "left foot sore."[12]   Id.   P.A. Aguilar ordered that Mr. Deese receive Betadine foot soaks once a day for fourteen days.  Aguilar's Deposition at 23; Medical Records at 5, 18.  He also ordered that Mr. Deese be permitted to receive his diabetic shoes from home.  Id.  Dr. Goodman reviewed this order and also signed it.  Aguilar's Deposition at 29-30; Medical Records at 18.  Mr. Deese received his diabetic shoes the next day.  Mr. Deese's Deposition at 87.

The purpose of Betadine soaks is "to prevent any infection building up." Aguilar's Deposition at 33.  Although P.A. Aguilar did not note any sign of infection, he ordered the Betadine soaks to prevent possible infection due to the dryness.  Id. at 35.

P.A. Aguilar wrote in Mr. Deese's medical record that he had spoken with Dr. Goodman on February 27, 2004, regarding a follow-up appointment to assess Mr. Deese's left knee.  Id. at 36, 55; Medical Records at 15.  He also wrote that Dr. Goodman would see Mr. Deese at the Chronic Care Clinic the next week.  Id.  According to P.A. Aguilar, once he spoke with Dr. Goodman, it was Dr. Goodman's responsibility to ensure that he saw Mr. Deese at a follow-up appointment.  Aguilar's Deposition at 38.

---

[12] P.A. Aguilar noted that he probably made a mistake in writing "left foot sore" because the right foot was the foot at issue.  Aguilar's Deposition at 29.

P.A. Aguilar states that he would have made a notation in the medical record if he had observed any discoloration of Mr. Deese's skin or any open sores or discharge. Id. at 47-49. There are no notations in the medical record entries made by P.A. Aguilar on February 27, 2004, reflecting any discoloration, open sores or discharge. Id. Indeed, Plaintiffs concede that when P.A. Aguilar examined Mr. Deese on February 27, 2004, "Mr. Deese was not observed to have any discoloration in his toe or foot." Plaintiffs' Opposition at 8.[13]

In his deposition, Mr. Deese contends that on February 27, 2004, he told P.A. Aguilar that he had stubbed his toe. Mr. Deese's Deposition at 91. He alleges that on that date, his toe was oozing and turning green. Id. at 89, 92. He asserts that his sock was soaked from the fluid oozing from his toe, and that the sore on the tip of his toe was the size of a dime. Id. at 92, 95.

Other than the February 26, 2004, Inmate Medical Request, Mr. Deese admits that he never filled out any other Inmate Medical Request form to request treatment for his foot. Id. at 98. He explains that he "did not know [he was supposed] to" fill out one of these forms to receive treatment. Id. However, on March 12, 2004, Mr. Deese submitted an Inmate Medical Request form, which

---

[13] Additionally, in the Amended Complaint at 5, Plaintiffs allege that Mr. Deese reported that his toe was becoming discolored approximately one week after he began receiving the Betadine foot soaks on February 28, 2004.

stated, "I AM A DIBEDIC [sic], I AM SICK[.]  I HAVE STAFF [sic] IN MY KNEE[.]"  Plaintiffs' Ex.[14] 3 at 15.  Although reflecting a request for medical attention, the form contains no indication that Mr. Deese was having any problem with his feet.  _Id_.

Mr. Deese asserts that he went to the diabetic clinic twice each day to have his insulin levels checked and to receive pills. Mr. Deese's Deposition at 98-99.  He did not recall telling anyone at the clinic about his green, oozing toe at any time between February 28, 2004, and March 8, 2004.  _Id_. at 99-102.  Although he initially asserted in his deposition, that he did not tell anyone but the inmate trustees who administered the Betadine soaks that his toe was green and oozing, _see_ _id_. at 100-01, he later indicated that he asked a female nurse when he would be able to see a doctor about his foot.  _Id_. at 135.

Mrs. Deese testified in her deposition that Mr. Deese had stubbed his right toe several weeks before he was incarcerated at the PTDF.  Plaintiffs' Ex. 9 at 31.  At the time he was arrested however, she stated that "It looked fine.  It was healing."  _Id_. She further stated that "it had healed up, as far as I could tell." _Id_.  She asserts that he did not have any swelling, redness or

---

[14] The Court will refer to the exhibits appended to Plaintiffs' Notice of Filing in Support of Consolidated Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (Doc. #82) as "Plaintiffs' Ex.".

signs of infection on the surface of his body at the time he was arrested.  Id. at 32.

Mrs. Deese testified that, approximately one month after Mr. Deese was incarcerated, he began to tell her that his right toe was sore.  Id. at 50-51.  She states that on March 9, 2004, she and Mr. Deese's daughter, Tammy Padgett, visited Mr. Deese.[15]  Id. at 57. During this visit, she states that Mr. Deese told them he was nauseated and did not feel well.  Id. at 58.  She alleges that approximately one to one and one-half weeks before the Tuesday, March 9, 2004, visit, Mr. Deese began telling her that his right toe was oozing.  Id. at 99-100.  She acknowledges that she never personally observed his right foot while he was incarcerated at the PTDF.  Id. at 80.

The Inmate Referral to Shands Jacksonville form, completed on March 13, 2004, states that Mr. Deese's left[16] foot was swollen and blue, and the great toe had a large sore on it.  Medical Records at 22.  The discharge summary from Shands Hospital reflects that Mr. Deese "presented to the emergency room on the 03/13 for a gangrenous toe on his right foot."  Plaintiffs' Ex. 5 at 1.  At the

---

[15] In her deposition, Mrs. Deese states that the visit occurred on the Tuesday before Mr. Deese was admitted to Shands Hospital. Mr. Deese was admitted to Shands Hospital on Saturday, March 13, 2004.  Thus, the Tuesday visitation would have been on March 9, 2004.

[16] It appears that the person completing the form erroneously recorded that the "left" foot was swollen and blue as it is undisputed that the right foot is the foot at issue in this case.

time of admission, the "right big toe was discolored and black in color.  It was nonfluctuant."[17]  Id. at 2.

Dr. B. Hudson Berrey, the doctor who amputated Mr. Deese's lower right leg on March 17, 2004, stated in his deposition that upon admission to Shands Hospital, Mr. Deese's great toe necrosis was dry, with "no pus or purulent drainage."  Dr. Berrey's Deposition[18] at 20-21.  According to Dr. Berrey, the fact that the foot was described as dry, with no pus or purulent drainage implies that there were no open sores on the foot.  Id. at 22.  Dr. Berrey further explained that great toe necrosis, which is dry, is not the sort of "wet, drippy kind of infection that you think about."  Id. Dr. Berrey described the condition of the right foot as follows:

> [T]here's a generalized rubor appearance to
> the skin, which means that it's sort of a
> redness with it, but the -- the toe isn't
> macerated.  It's -- we generally talk about
> dry gangrene and wet gangrene.  You know, wet
> gangrene is more associated with -- with
> infection, typically what we think of as
> infection, although they both can dry, meaning
> more associated with the vascular -- vascular
> disease, the fact that just -- you know, if
> you turn off the inflow or turn off the blood
> supply, something is going to die, and if
> there isn't any, if the skin is intact, it may
> just mummify.  So, I mean, it sounds like this

---

[17] According to Dr. Michael A. McIlroy, one of the experts retained by Defendants, the fact that the toe was described as nonfluctuant means that there was no fluid or pus below the skin. See Michael A. McIlroy's Expert Report (Doc. #57-6) at 4.

[18] The Deposition of Dr. B. Hudson Berrey (Doc. #64-3) (hereinafter Dr. Berrey's Deposition) is appended to CMS's Motion (Doc. #64).

> -- from this is that -- you know, there was
> somewhat of a dry state with it which implies
> more of a vascular state than it does
> infectious.

<u>Id</u>. at 21-22.

In his deposition, Dr. Berrey opined that Mr. Deese suffered from peripheral arterial disease and severe calcific atherosclerosis. <u>Id</u>. at 10, 12. He described this condition as a "plaque formation which fills the inner wall of an artery and narrows the caliber of the vessel and restricts the amount of blood flow through it." <u>Id</u>. at 12.

Dr. Berrey testified that on March 13, 2004, Mr. Deese's condition was listed as "dysvascular foot with great toe necrosis," which in laymen's terms, is "a foot that is not getting an adequate blood supply." <u>Id</u>. at 14. There was no measurable blood flow in the foot. <u>Id</u>. at 15-16. Dr. Berrey opined that there were no detectable pulses in Mr. Deese's right foot due to his "severe vascular disease, peripheral artery disease." <u>Id</u>. at 16. Dr. Berrey stated that "once you've got that severe of vascular disease, often it's just a matter of time before you're going to end up with an amputation because there isn't any way to reverse that." <u>Id</u>. at 18. According to Dr. Berrey, the amputation of Mr. Deese's lower right leg was necessary because he had calcification in his arteries which prevented blood flow into his lower leg. <u>Id</u>. at 14-20.

One of the experts retained by Defendants, Dr. Michael A. McIlroy,[19] also opined that Mr. Deese suffered from dry gangrene, due to severe vascular disease.   Dr. McIlroy's expert report states, in pertinent part, the following:

> Mr. Earl Deese was a 67 year old man when he had a worsening of his right leg peripheral vascular disease associated with smoking, diabetes, atherosclerotic vascular disease and hypertension.  This necessitated an above the knee Guillotine Amputation on March 17, 2004. Prior to this amputation, he had very typical leg clinical findings associated with progressive vascular disease.  He would not have been a surgical candidate give[n] the diffuseness of his vascular disease.   No medical or surgical therapy would have altered the outcome of him losing his leg – this would be the natural medical course of this condition and not related to treatment rendered.  **While it is alleged that Dr. Goodman should have done several things [see complaint] that would have saved Mr. Deese's leg, in my strong opinion, there is nothing that Dr. Goodman could have done medically to save this leg.**  I say this with very high confidence given my extensive training and experience in treating patients such as Mr. Deese for over twenty years.
>
> . . . .
>
> First of all, Mr. Deese had long standing Diabetes Mellitus and severe peripheral vascular disease.  The natural course for his occlusive vascular leg condition would be that of needing an amputation.  Again, no medical or surgical care could alter his progressive vascular occlusion.  The vascular disease was

---

[19] The Court has reviewed Dr. McIlroy's qualifications and finds that he is qualified to provide expert testimony regarding Mr. Deese's medical condition.

widespread and he would have lost his leg regardless of any medical therapy provided.

My opinion is based on the natural course of vascular disease in patients with Diabetes and a smoking history, etc, given my extensive training in medicine and infections.  I am enclosing a reference from _Uptodate_: 'Clinical features and diagnosis of diabetic foot infections' also that [sic] clearly illustrates how very common it is for diabetic patients to have amputations [**"in one study, over 1/2 of patients hospitalized for diabetic foot infections required amputation"**] [printed 3/09/08] - not due to malpractice but rather the natural course of this disease process.

His arterial disease was peaking in terms of severity in early 2004 totally unrelated to any infections ongoing.  Again, he would not have been a candidate for bypass surgery of the right leg given the diffuse nature of his disease [no pulses at the knee level and vascular calcifications of the foot seen on the x-ray and microscopic disease that would not be amenable to surgical intervention in the soft tissues of the foot.[]]  To put this in perspective - I am including a publication on vascular disease in diabetics and the frequency of amputations.  This article is for general reference only an[d] not submitted as totally authoritative.  Mr. Deese had this type of severe and progressive arteriosclerosis of his right leg and was not amenable to medical or surgical therapy.

Prior to admission to Shands and the subsequent 'sepsis' - Mr. Deese['s] blood supply became so inadequate - it allowed for Streptococcal pyogenes from his skin to enter his blood stream and initiate a blood sepsis. He was ill from this but it was not a 'septic' leg so to speak.  He did not have a significant infection of the right leg - only small microabscesses as seen on the autopsy - these developed due to poor blood supply.

> Even if the PA gave the patient antibiotics on
> March 9, 2004 - there was no infection then to
> be treated and due to the poor circulation -
> no antibiotics in the blood stream would have
> reached the right lower extremity below the
> knee. Also, with regard to starting Mr. Deese
> on Dicloxacillin - in my opinion - this was
> not indicated - either for prophylaxis or
> treatment.  It would not have prevented Mr.
> Deese['s] end stage vascular problem or the
> infection that developed from this problem.

Michael A. McIlroy's Expert Report (Doc. #57-6) at 6-7 (emphasis

added).  Mr. Deese presented no medical or expert opinions

disputing the opinion offered by Dr. McIlroy.

As noted previously, to defeat P.A. Aguilar's motion for

summary judgment with respect to the deliberate indifference claim,

Plaintiffs must produce evidence from which a reasonable jury could

conclude that: (1) Mr. Deese had an objectively serious medical

need, (2) P.A. Aguilar acted with deliberate indifference to that

need, and (3) Mr. Deese's injury was caused by the wrongful conduct

of P.A. Aguilar.  Goebert, 510 F.3d 1312, 1326.

In this case, Plaintiffs have failed to produce any evidence

suggesting the gangrene and the resulting amputation were caused by

the allegedly inadequate medical treatment Mr. Deese received from

P.A. Aguilar.  Defendants have presented evidence from Dr. Berrey

and Dr. McIlroy that the gangrene in Mr. Deese's right foot was not

caused by any sore on the right toe.  Instead, according to these

physicians, it was caused by advanced vascular disease and the lack

of blood flow to the lower portion of the right leg.  Both of these

- 24 -

physicians have opined that the amputation would have been necessary no matter what treatment was rendered in response to the sore on Mr. Deese's right big toe.

In response to Defendant's motion for summary judgment, Plaintiffs must go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, and/or admissions on file, that the allegedly inadequate medical treatment Mr. Deese received from P.A. Aguilar caused the gangrene and resulting amputation. Plaintiffs have provided no such evidence to this Court.  Indeed Plaintiffs did not submit any evidence to this Court from a medical expert to support their allegation that the harm was caused by P.A. Aguilar's acts or omissions.  Absent some evidence that Mr. Deese's injury was caused by the wrongful conduct of P.A. Aguilar, no reasonable jury could conclude that P.A. Aguilar was deliberately indifferent to Mr. Deese's serious medical needs.

Assuming *arguendo* that Plaintiffs provided evidence of causation sufficient to survive P.A. Aguilar's motion for summary judgment, Plaintiffs' deliberate indifference claim nevertheless fails.  If this Court assumes that there was a sore on Mr. Deese's right big toe[20] when P.A. Aguilar examined Mr. Deese on February 27, 2004, and further assumes that such a sore, combined with Mr.

---

[20] As noted previously, Plaintiffs concede that, despite Mr. Deese's deposition testimony to the contrary, P.A. Aguilar did not observe Mr. Deese's foot to be discolored when he met with P.A. Aguilar on February 27, 2004.

Deese's history of diabetes, presented a serious medical need, P.A. Aguilar was not deliberately indifferent to that need.  Instead, he ordered that Mr. Deese receive Betadine foot soaks and that he be permitted to receive his diabetic shoes from family members.  One of the experts retained by the Defendants, Dr. Thomas G. Graves, opined that the steps taken by P.A. Aguilar (ordering Betadine soaks and permitting Mr. Deese to have his diabetic shoes) "were appropriate to prevent infection." Defendant Carey Goodman, M.D.'s Expert Report: Thomas G. Graves, M.D., F.A.A.F.P. (Doc. #57-9) at 5.[21]  Plaintiffs have not provided any evidence that such steps were not sufficient under prevailing medical standards.  Thus, P.A. Aguilar is entitled to summary judgment in his favor with respect to the deliberate indifference claim against him.

Dr. Goodman also contends that he is entitled to summary judgment in his favor with respect to the deliberate indifference claim against him.  In this case, the parties agree that Dr. Goodman never saw Mr. Deese in person.  In Goodman's Motion (Doc. #57), Dr. Goodman describes his involvement in Mr. Deese's medical care as follows:

> Following the initial physical assessment of Mr. Deese on January 27, 2004, Dr. Goodman spoke with the nurse practitioner who examined Mr. Deese and ordered heart medications and diabetes medications for Mr. Deese.   Dr.

---

[21] The Court has reviewed the qualifications of Dr. Graves and finds that he is qualified to provide expert testimony regarding the appropriate standard of care.

Goodman did not prescribe the dicloxacillin
that Mr. Deese requested, because there were
no signs of infection.  (Exhibit A, p.10)

After Nelson Aguillar [sic], P.A. examined Mr.
Deese on February 26, 2004, P.A. Aguillar
[sic] discussed Mr. Deese's repeated demand
for dicloxacillin with Dr. Goodman on February
27, 2004.  Again, because there were no signs
of infection, Dr. Goodman did not prescribe
dicloxacillin.  (Exhibit A, p.41)

On March 9, 2004, a nurse examined Mr. Deese
regarding his complaints of right knee pain
and Mr. Deese's claim that he had a "staph"
infection in his knee.  The nurse called Dr.
Goodman and discussed this complaint with him.
Mr. Deese's vital signs were normal.  Because
Mr. Deese's knee did not show signs of
infection (e.g., swelling, redness, warmth to
the touch), Dr. Goodman advised that there was
no need for antibiotics or other medications
at that time.  (Exhibit A, p.42).

Dr. Goodman did not speak to anyone else about
Mr.  Deese  until  after  Mr.  Deese  was
transferred  to  Shands  Hospital.   He  was
informed of Mr. Deese's amputation.  (Exhibit
A, p. 44).

Goodman's Motion (Doc. #57) at 10-11 (emphasis deleted).

As noted previously, Plaintiffs contend that the serious
medical need at issue in this case was "an open sore on [Mr.
Deese's] large right toe[.]"  Plaintiffs' Opposition at 6.
Plaintiffs assert that Dr. Goodman "knew Mr. Deese to be a long
standing diabetic and w[as] aware of the risks inherent with a
diabetic patient forming sores on his lower extremities." Id. at
7.  Plaintiffs further allege that the "delay in sending Mr. Deese
to Shands Hospital for medical intervention worsened his plight as

shortly after admission, his right leg had to be amputated above the knee." Id.

Plaintiffs have presented the Court with no evidence suggesting that anyone spoke with Dr. Goodman about the condition of Mr. Deese's feet.[22] The record reflects that the only information Dr. Goodman had regarding the condition of Mr. Deese's foot was the information contained in Mr. Deese's medical record. And, as stated previously, the only notation in Mr. Deese's medical record regarding the condition of Mr. Deese's right foot prior to the day he was referred to Shands Hospital (March 13, 2004) was P.A. Aguilar's February 27, 2004, notation that the tip of the big toe on Mr. Deese's right foot was dry and cracked, but there were no open lesions. P.A. Aguilar prescribed Betadine soaks and ordered that Mr. Deese be permitted to wear his diabetic shoes. Dr. Goodman co-signed this order. Plaintiffs' Ex. 6 at 84.

Again, Plaintiffs' deliberate indifference claim must fail because Plaintiffs have failed to identify any facts in dispute

---

[22] In his deposition, Dr. Goodman states that the conversation he had with P.A. Aguilar on February 27, 2004, pertained to Mr. Deese's request for a Dicloxicillin prescription due to his history of staph infections in his left knee. Plaintiffs' Ex. 6 at 75. They did not discuss the request for diabetic shoes or anything relating to Mr. Deese's feet. Id. at 69. P.A. Aguilar stated in his deposition that he did not recall the conversation with Dr. Goodman; however, the medical record entry he made stated that he spoke with Dr. Goodman about a follow-up appointment for Mr. Deese's left knee. Aguilar's Deposition at 36. Plaintiffs have provided no evidence to create a genuine issue of material fact as to the content of this conversation.

with respect to the cause of Mr. Deese's leg amputation.  Indeed
Plaintiffs have not provided any evidence to suggest a causal
connection between Dr. Goodman's acts or omissions and Mr. Deese's
injuries.  As Plaintiffs have failed to produce any evidence that
the gangrene and the resulting amputation were caused by the
allegedly inadequate medical treatment Mr. Deese received from Dr.
Goodman, summary judgment is due to be granted in Dr. Goodman's
favor with regard to the deliberate indifference claim.

Assuming *arguendo* that Plaintiffs provided evidence of
causation sufficient to defeat Dr. Goodman's motion for summary
judgment, the deliberate indifference claim fails.  Preliminarily,
Dr. Goodman was not on notice of any serious medical need with
respect to Mr. Deese's foot, as the only information he had
regarding the condition of the foot was P.A. Aguilar's notation
that the big toe on Mr. Deese's right foot was dry and cracked, but
there were no open lesions.  However, if such a condition in a
diabetic patient constitutes a serious medical need, Dr. Goodman
was not deliberately indifferent to that need.  Dr. Thomas G.
Graves, addressed this issue in his report as follows:

> On February 27, 2004, Mr. Deese reported
> a sore on his foot to medical staff and in
> response was given betadine soaks and was
> permitted to have special diabetic shoes from
> home.  These steps were appropriate to prevent
> infection.  When Dr. Goodman was consulted
> over the telephone on March 9, 2004, Mr. Deese
> was not complaining of any wound on his toe at
> that time.  Thus, no further action was
> necessary regarding Mr. Deese's earlier foot

> complaint, which had been handled
> appropriately. Accordingly, Dr. Goodman did
> not violate the standard of care with respect
> to treatment of Mr. Deese's foot.

Defendant Carey Goodman, M.D.'s Expert Report: Thomas G. Graves,

M.D., F.A.A.F.P. (Doc. #57-9) at 5.

Defendant Goodman has provided evidence that his care with

respect to Mr. Deese's foot was appropriate to address the dry,

cracked toe. Thus, to survive summary judgment, Plaintiffs must go

beyond the pleadings to show that Dr. Goodman had a subjective

awareness of an objectively serious medical need and that he

provided an objectively insufficient response to that need.

Plaintiffs have provided no such evidence to this Court. Thus, Dr.

Goodman is entitled to summary judgment in his favor with respect

to the deliberate indifference claim against him.

### B. Counts VII and VIII of the Amended Complaint

In Counts VII and VIII of the Amended Complaint, Plaintiffs

raise state law negligence claims against Dr. Goodman and P.A.

Aguilar. Defendants Goodman and Aguilar request that summary

judgment be entered in their favor with respect to these two

claims. See Goodman's Motion (Doc. #57) at 13-17; Aguilar's

Supplemental Motion (Doc. #59).

> To prevail in a medical negligence action
> under Florida law, "a plaintiff must establish
> the following: the standard of care owed by
> the defendant, the defendant's breach of the
> standard of care, and that said breach
> proximately caused the damages claimed."
> Gooding v. University Hosp. Bldg., Inc., 445

> So.2d 1015, 1018 (Fla. 1984).  Florida courts
> follow the more likely than not standard of
> causation and require proof that the
> negligence probably caused the plaintiff's
> injury. Id.

Daniels v. Prison Health Services, Inc., No. 8:05-cv-1392-T-30TBM,
2007 WL 4287555, at *6 (M.D. Fla. Dec. 4, 2007).

Plaintiffs' negligence claims against these two Defendants
fail for two reasons.  First, as noted previously, Defendants have
provided expert testimony from Dr. Thomas G. Graves, stating that
the provision of Betadine soaks and special diabetic shoes from
home was appropriate to prevent infection of Mr. Deese's foot and
did not violate the standard of care.  Thus, to survive summary
judgment, Plaintiffs must go beyond the pleadings to show that Dr.
Goodman and P.A. Aguilar violated the appropriate standard of care.
Plaintiffs have provided no such evidence to this Court.

Additionally, for the reasons stated in the discussion of the
deliberate indifference claims against these two Defendants,
Plaintiffs have not provided any evidence that the care or lack of
care provided by these two Defendants was the proximate cause of
Mr. Deese's injuries.  Accordingly, summary judgment will be
entered in favor of Defendants Goodman and Aguilar with respect to
Counts VII and VIII.

### C. Counts I and II

In Counts I and II of the Amended Complaint, Plaintiffs claim
that Defendants CMS and the COJ were deliberately indifferent Mr.

Deese's serious medical needs.  Both of these Defendants assert
that they are entitled to summary judgment in their favor because:
(1) vicarious liability is not applicable in 42 U.S.C. § 1983
claims; (2) Plaintiffs do not allege a CMS or COJ custom, policy or
procedure that led to the conduct complained of; and, (3) there is
no evidence that CMS or the COJ were deliberately indifferent to
Mr. Deese's serious medical needs.

The Eleventh Circuit Court of Appeals has set forth the
standard for municipal liability in § 1983 cases.

> Although the Supreme Court has held that
> counties (and other local government entities)
> are "persons" within the scope of § 1983, and
> subject to liability, [Plaintiffs] cannot rely
> upon the theory of *respondeat superior* to hold
> the C[ity] liable.  See Monell v. Dept. of
> Soc. Servs., 436 U.S. 658, 692, 98 S.Ct. 2018,
> 56 L.Ed.2d 611 (1978) (finding that § 1983
> "cannot be easily read to impose liability
> vicariously on governing bodies solely on the
> basis of the existence of an employer-employee
> relationship with a tortfeasor"); Pembaur v.
> Cincinnati, 475 U.S. 469, 479, 106 S.Ct. 1292,
> 89 L.Ed.2d 452 (1986).  "It is only when the
> 'execution of the government's policy or
> custom . . . inflicts the injury' that the
> municipality may be held liable." City of
> Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct.
> 1197, 103 L.Ed.2d 412 (1989).  A county [or
> city] does not incur § 1983 liability for
> injuries caused solely by its employees.
> Monell, 436 U.S. at 694, 98 S.Ct. 2018.  Nor
> does the fact that a plaintiff has suffered a
> deprivation of federal rights at the hands of
> a municipal employee infer municipal
> culpability and causation.  Bd. of County
> Com'rs v. Brown, 520 U.S. 397, 403, 117 S.Ct.
> 1382, 137 L.Ed.2d 626 (1997).  Instead, to
> impose § 1983 liability on a municipality, a
> plaintiff must show: (1) that his

> constitutional rights were violated; (2) that
> the municipality had a custom or policy that
> constituted deliberate indifference to that
> constitutional right; and (3) that the policy
> or custom caused the violation. See Canton,
> 489 U.S. at 388, 109 S.Ct. 1197.

McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (footnote

omitted).

The parties agree that CMS was under contract with the COJ to

furnish health care services for inmates at the PTDF.

> When a private entity like [CMS]
> contracts with a county to provide medical
> services to inmates, it performs a function
> traditionally within the exclusive prerogative
> of the state. E.g., Howell,[23] 922 F.2d at 724;
> Ort v. Pinchback, 786 F.2d 1105, 1107 (11th
> Cir. 1986); Ancata v. Prison Health Servs.,
> Inc., 769 F.2d 700, 705 (11th Cir. 1985). In
> so doing, it becomes the functional equivalent
> of the municipality.

Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997) (per curiam).

Thus, the standard applicable for imposing liability in this § 1983

action on the COJ is equally applicable to CMS.

In Count II of their Amended Complaint, Plaintiffs assert the

following:

> Defendant, City of Jacksonville and,
> through its agents and employees, acting
> within their authority and under color of
> state law, instituted and followed policies,
> procedures and customs which directly resulted
> in deliberate indifference to Mr. Deese's
> serious medical needs. The City of
> Jacksonville has knowledge of a systematic and
> widespread practice wherein inmates at the

---

[23] Howell v. Evans, 922 F.2d 712 (11th Cir. 1991).

Duval County PTDF receive inadequate medical
care despite an obvious and apparent need for
adequate medical care, but the City has failed
to provide adequate care to such inmates.
Additionally, in failing to discipline staff
for their actions and inactions, Defendant
City of Jacksonville has ratified such
decisions and reasons for those decisions,
thus constituting a policy, practice or
custom. Alternatively, medical staff at the
PTDF acted as final policy makers for the City
of Jacksonville as their decisions were not
immediately or effectively reviewable.
Further, Defendant City of Jacksonville failed
to adequately train its agents and employees
despite a clearly obvious and apparent need
for such training. . . .

Amended Complaint at 7.

In the COJ's Motion (Doc. #62) and CMS's Motion (Doc. #64),
and the exhibits submitted therewith, these two Defendants have
provided argument and evidence refuting Plaintiffs' allegations
that Mr. Deese's injuries were the result of any official policy,
practice or custom or failure to train on the part of these two
Defendants. See COJ's Motion (Doc. #62) at 12-17 and the exhibits
cited therein; CMS's Motion (Doc. #64) at 10-14 and the exhibits
cited therein. Other than the allegations in the Amended
Complaint, Plaintiffs have not offered any argument or evidence
that Mr. Deese's injuries were the result of any official policy,
practice or custom or failure to train on the part of these two
Defendants. Indeed Plaintiffs provided no evidence supporting
these broad allegations. Thus, the wholly unsupported allegations

of the Amended Complaint are insufficient to survive the pending motions for summary judgment.

Plaintiffs allege that "CMS can be held liable on the basis that it delegated final policymaking authority with respect to the hospitalization of inmates to its Medical Director, Defendant Goodman." Plaintiffs' Opposition at 11. Plaintiffs further claim that:

> Pursuant to the agreement [between the COJ and CMS], inmates at the PTDF could be treated at an outside hospital under the following conditions:
>
>> CMS will arrange for the admission of inmates/detainees who, in the opinion of the CMS medical director, require hospitalization. Concommently, CMS will be fully responsible for medical costs or expenses incurred at any healthcare facility other than Shands of Jacksonville.
>
> *Id.* at p. 9. Defendant Goodman was the medical director for CMS at the time of the incident alleged in the Complaint. See Goodman depo. at p. 9. Accordingly, it was Dr. Goodman's responsibility to ensure that inmates that required outside hospitalization received such treatment as Correctional Medical Services and the City of Jacksonville had delegated final policy making authority on hospitalization of inmates to the medical director. *See* Tarnowski depo. at pp. 34-35. As a result of Defendant Goodman's decision not to transfer Mr. Deese to an outside hospital, CMS and the City may be liable.

Plaintiffs' Opposition at 12.

Municipal liability may be established on the basis of a single decision made by a final policymaker.

> [Municipal liability for a § 1983 claim] may attach to a single decision made by a municipal official if that municipal official is the final policymaker for the municipality with respect to the subject matter in question. Under this theory of municipal liability, the first step of the inquiry is to identify those individuals whose decisions represent the official policy of the local governmental unit. Jett v. Dallas Independent School Dist., 491 U.S. 701, 736, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). As already discussed, this is a question of law to be resolved by the trial court judge. Id. See City of St. Louis v. Praprotnik, 485 U.S. 112, 123-24, 108 S.Ct. 915, 924, 99 L.Ed.2d 107. In making this determination, the court should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law. Jett, 491 U.S. at 737, 109 S.Ct. at 2724. See Pembaur, 475 U.S. at 485, 106 S.Ct. at 1301 (county prosecutor found to be final policymaker based in part on relevant operational practices). See also Williams v. Butler, 863 F.2d 1398, 1403 (8th Cir. 1988) (in banc) (plurality opinion), cert. denied, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989). The court must also ensure that the municipal official possesses the authority and responsibility for establishing final policy with respect to the issue in question. See Praprotnik, 485 U.S. at 127, 108 S.Ct. at 926; Pembaur, 475 U.S. at 483-84, 106 S.Ct. at 1300. Only after this determination is made is the second step of the inquiry relevant: Did the challenged decision or act of the official cause the deprivation of the plaintiff's rights?

Daniels v. Prison Health Services, Inc., No. 8:05-cv-1392-T-30, 2008 WL 111308, *2 (M.D. Fla. Jan. 8, 2008) (quoting Mandel v. Doe,

888 F.2d 783, 793 (11th Cir. 1989)).   However, this Court need not address the more difficult question of whether Dr. Goodman was a final policymaker as Plaintiffs have failed to create a genuine issue of material fact as to whether the challenged decision caused any deprivation of Mr. Deese's rights.   For the reasons stated in the discussion of the deliberate indifference claim against Dr. Goodman, Plaintiffs presented no evidence of any causal connection between Dr. Goodman's failure to transfer Mr. Deese to an outside hospital at an earlier date and a deprivation of Mr. Deese's federal constitutional rights.[24] Accordingly, summary judgment will be entered in favor of Defendants CMS and the COJ with respect to Counts I and II.

### D. Counts V, VI and IX

The only counts that remain in this action are Count V (a negligence claim against the COJ), Count VI (a negligence claim against CMS) and Count IX (Mrs. Deese's loss of consortium claim against all four Defendants).   District Courts may refrain from exercising supplemental jurisdiction over a state claim where it

---

[24] Moreover, Dr. Goodman was never given any information which would have led him to believe that the hospitalization of Mr. Deese was needed.   The information Dr. Goodman received from P.A. Aguilar during their February 27, 2004, telephone conversation would not have led him to believe hospitalization was necessary or appropriate.   Additionally, when Dr. Goodman was contacted on March 9, 2004, in reference to Mr. Deese's complaint about a staph infection in his knee, the nurse told Dr. Goodman that there was no sign of infection in the knee.   Thus, once again, there was no indication that hospitalization was necessary or appropriate.

has dismissed all the underlying federal claims.  <u>See</u> <u>Cook v.</u> <u>Sheriff of Monroe County, Florida</u>, 402 F.3d 1092, 1123 (11th Cir. 2005); 28 U.S.C. § 1367(c)(3).  "In making this decision, the court 'should take into account concerns of comity, judicial economy, convenience, fairness, and the like.'"  <u>Cook</u>, 402 F.3d at 1123.  In the interests of judicial economy and convenience, the Court declines to exercise supplemental jurisdiction over the remaining negligence and loss of consortium claims in this action.

Accordingly, for all of the above-stated reasons, Counts V, VI and IX of the Amended Complaint will be dismissed without prejudice, Defendants' motions for summary judgment will be granted, and judgment will be entered in the Defendants' favor with respect to Counts I, II, III, IV, VII and VIII of the Amended Complaint.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    Counts V, VI and IX of the Amended Complaint are **DISMISSED without prejudice.**

2.    Defendant, Nelson Aguilar, P.A.'s, Motion for Partial Summary Judgment as to the Chapter 42 United States Code Section 1983 Claim and Memorandum of Law in Support Thereof (Doc. #53) is **GRANTED.**

3.     Defendant, Nelson Aguilar, P.A.'s, Supplemental Motion for Partial Summary Judgment as to the Medical Negligence Claim and Memorandum of Law in Support Thereof (Doc. #59) is **GRANTED.**

4.     Defendant Carey Goodman, M.D.'s Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (Doc. #57) is **GRANTED.**

5.     Defendant, City of Jacksonville's, Motion for Partial Summary Judgment as to the Chapter 42 United States Code Section 1983 Claim and Memorandum of Law in Support Thereof (Doc. #62) is **GRANTED.**

6.     Defendant, Correctional medical Services, Inc.'s, Motion for Summary Judgment and Motion for Judgement on the Pleadings and Memorandum of Law in Support Thereof (Doc. #64) is **GRANTED.**

7.     The Clerk shall enter judgment in Defendants' favor with respect to Counts I, II, III, IV, VII and VIII of the Amended Complaint.

8.     The Clerk shall terminate all pending motions and close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 9th day of December, 2008.

**MARCIA MORALES HOWARD**
United States District Judge

ps 12/9
c:
Counsel of Record

- 39 -